**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                         **Case No. 8:13-cr-237-T-23TBM**

**DUANE CRITHFIELD and**
**STEPHEN DONALDSON, SR.,**

        **Defendants.**
_____/

**REPORT AND RECOMMENDATION**

      THIS MATTER is before the Court on referral for a Report and Recommendation on

**Defendants' Motion to Suppress - Searches and Incorporated Memorandum of Law**

(Doc. 121), the government's response in opposition (Doc. 133), Defendants' reply (Doc.

145), and the government's sur-reply (Doc. 151).[1]  Oral arguments on the Motion were taken

_____

      [1]Attached to the Motion are a number of exhibits, including, *inter alia*, the search warrant affidavit ("the Affidavit") (Doc. 121-1); summary opinions rendered by the Handler Thayer & Duggan law firm (Docs. 121-2, 121-3 and 121-4); a December 22, 2003, opinion letter by Handler Thayer & Duggan (Doc. 121-5); an affidavit from defense investigator George Wisnovksy (Doc. 121-7); and redacted transcripts of certain monitored and recorded calls or meetings by the undercover agents (Docs. 121-8 through 121-21).
      The government includes in its opposition a copy of the search warrant Affidavit; decisions of the district court and the Fifth Circuit Court of Appeals in the so-called *Salty Brine* litigation involving a similar business protection plan (Docs. 133-2 and 133-3); and a copy of a grand jury subpoena served on Offshore Trust Services, Inc., in May 2007 (Doc. 133-4).
      The reply and sur-reply address the limited issue of the inevitable discovery exception.

December 22, 2014.[2]  After thorough review and consideration, I recommend that the Motion

be **denied.**

I.

Defendants Duane Crithfield and Stephen Donaldson, Sr., stand indicted at Count One

of the Superseding Indictment on allegations that they conspired to defraud the United States

by impeding, impairing, obstructing, and defeating the lawful functions of the Internal

Revenue Service in violation of 18 U.S.C. § 371.  (Doc. 47).  In short, it is alleged that the

Defendants promoted and implemented an abusive tax evasion scheme that permitted and

induced wealthy clients to claim improper business expense deductions on U.S. tax returns for

sham "insurance premium" payments made to offshore entities controlled by Defendants.[3]  In

Counts Two and Three, Defendants stand indicted for aiding and assisting in the presentation

---

[2]Prior to the hearing, the parties agreed, albeit for different reasons, that an evidentiary hearing was unnecessary even on the claims of *Franks* violations.  *See Franks v. Delaware*, 438 U.S. 154 (1978).  Defendants asserted a hearing would serve no useful purpose because the facts supporting their argument are generally undisputed.  The government urged that Defendants are not entitled to a *Franks* hearing as a matter of law.

[3]By the allegations, Defendants founded and operated or otherwise were affiliated with a number of offshore entities including: Alliance Holding Co., Ltd.; Fidelity Insurance Co., Ltd.; First Fidelity Trust, Ltd.; and Foster & Dunhill, Ltd.  Using these and other entities, the government claims that Defendants offered and implemented "business protection plans" designed for asset protection and illegal tax benefits to clients.

Offshore Trust Services, Inc., a Florida corporation located in Tampa, Florida, performed administrative services for Alliance.  Foster & Dunhill, Ltd., which also had offices in Tampa, Florida, performed financial and marketing services.  Prominent in the Affidavit in support of the search warrant, if not identified in the indictment, is David McNamee, a Clearwater resident who was initially identified as president of Offshore Trust Services, Inc., but who, at the time of the warrant application, was president of Fidelity Insurance Co., Ltd.

of tax returns containing false and fraudulent deductions in violation of 26 U.S.C. § 7206(2) and 18 U.S.C. § 2. *Id.*

## A.

Defendants now seek to suppress all evidence seized by federal agents on May 9, 2007, pursuant to search warrants for three locations issued upon the affidavit of IRS Special Agent Carl W. Coffman (the "Affiant").[4]  Defendants argue that the search warrants were issued on an Affidavit (Doc. 121-1) that contained irrelevant, inadmissable, and stale information and that lacked probable cause of illegality.  Moreover, the Affiant submitted materially false and misleading statements and made willful material omissions concerning the business protection plan that the Defendants promoted and implemented, such that a finding of probable cause was precluded.

Defendants assert that the Affidavit lacked evidence to support a finding of probable cause that Defendants willfully conspired to defraud the United States through an illegal tax scheme or that they caused numerous false and fraudulent tax returns to be filed.  In support of this assertion, Defendants first claim that the Affiant relied upon his beliefs and opinions, rather than facts, about various matters and such are inadequate to support a finding of probable cause.  Defendants cite the Affiant's beliefs and conclusory opinions set forth at ¶¶ 5(I), 7, 23(I), 45, 48, 51, 57, 61, 64, and 71-72 of the Affidavit as examples and urge that such should be stricken.

_____

[4]Searches were conducted at office of Offshore Trust Services, Inc., in Tampa, Florida; the office of Foster & Dunhill, Ltd., in Tampa, Florida; and David McNamee's home office at his residence in Clearwater, Florida.  (Doc. 121-1 at 1).

Second, in his effort to show an illegal tax scheme and thus illegal conduct to support issuance of a warrant, Defendants claim the Affiant falsely characterized the business protection plan ("BPP") as "sham insurance" without establishing the same and then concealed from the issuing magistrate evidence from several reputable sources (including two prominent tax law firms and a former IRS assistant regional commissioner) which confirmed the BPP was lawful, the insurance components legitimate, and the tax deduction for the cost of the insurance proper.

They urge that instead of offering proof, the Affiant simply besmirched legitimate and reputable offshore entities and labeled their activities as illegal, despite contrary evidence. Similarly, they claim the Affiant wrongfully named attorneys, a former IRS official, and others who supported the legitimacy of this tax avoidance scheme as co-conspirators.

Defendants contend that the Affiant's summary of the illegal tax scheme in the Affidavit – in particular, his description of the illegal "3-step transaction" called for under the BPP (*see* Doc. 121-1 at 2-3) – contains unsupported legal conclusions and factual misrepresentations which preclude or undermine a finding of probable cause. Defendants urge that the Affiant's assertions that the BPP resulted in "sham insurance" and a "sham tax deduction" were not only factually unsupported but also were legal conclusions the Affiant was unqualified to make and which were contradicted by the opinions of reputable tax law

firms.[5]  Moreover, the Affiant's stated belief that no claims against the insurance policies had been or could be filed was also factually incorrect, contradicted by documents in his possession and numerous representations by Defendants and their representatives that the insurance was real and claims should be made.  And, his conclusion that a business deduction for 100% of the premium as an ordinary and necessary business expense was improper is unsupported and again contradicted by the opinions of tax counsel and the government's present recognition of the validity of the HTD approval letter.  Finally, they claim that the assertion that co-conspirators improperly "funneled" 85% of the premium back to the client simply ignores that such was part of the "road map" set out in the HTD opinion letter which the government now accepts.  Thus, by HTD's analysis and approval, the business owner could lawfully take a loan against the cash value of a life insurance policy purchased as part of the BPP without incurring any tax consequences.

Defendants cite numerous recorded telephone calls and meetings with undercover agents wherein the agents were advised by various sources, including the former IRS official William Simon and HTD attorney James Duggan, that the BPP insurance had to be real and to

---

[5]Central to Defendants' arguments are the opinions offered by two tax law firms who approved the BPPs offered by Defendants.  By these firms' assessments, the BPPs offered a lawful and legitimate means for business owners to reduce their tax liability through a deduction for insurance premiums.  As discussed below, they claim the Affiant was aware of both firms' opinions, yet failed to fairly present the opinion of the Lord Bissell Brooke ("Lord Bissell") firm and concealed the opinions of the Handler Thayer and Duggan ("HTD") firm from the magistrate judge.

Moreover, while the Affiant identified the attorneys and the former IRS regional commissioner as co-conspirators, the government now concedes that the opinion letters were not fraudulent or sham opinions and it declines to use such labels against such persons.

make the plan IRS compliant.[6]  Thus, the Affiant's opinion that the insurance purchased under the BPP was "unnecessary" is factually unsupported and false.

Defendants also challenge probable cause on grounds that portions of the Affidavit were stale and/or irrelevant.  They contend that certain allegations in the Affidavit were purely pejorative, stale, and irrelevant to the matter of probable cause to believe Defendants were presently involved in an illegal tax scheme – i.e., the allegations of a prior and unrelated investigation into Crithfield at ¶¶ 10 and 11; conclusory references to leads from the IRS Lead Development Center without full and fair disclosure at ¶ 14; allegations against tax attorney, Arthur Boelter, purportedly from an unidentified informant concerning activity in 2001 (six years prior to the Affidavit) at ¶ 15; and the anecdotal evidence at ¶ 19 referencing activity involving a client of First Fidelity Trust, LLC, in 1999 and 2000.

Moreover, all the information concerning the BPP approved by Lord Bissell dated to the early 2000s and was stale and irrelevant to the BPP that the Affiant actually investigated. Indeed, they argue the activities related to the Lord Bissell approved BPP all occurred outside of the applicable statute of limitations.  By Defendants' argument, there were two distinct BPPs, which they delineate as "BPP-I" and "BPP-II."  Only the later plan, the BPP-II,

---

[6]Defendants submit an affidavit from George Wisnovksy, an attorney and former special agent with the FBI for twenty-six years.  (Doc. 121-7).  Therein, Wisnovksy recounts his review of purportedly thousands of pages of transcripts of conversations recorded during the undercover operation.  By his account, among other significant matters, the "UC transcripts are repleat with multiple references to the business protection product having to be lawful and compliant with United States tax laws and valid, lawful insurance."  *Id.* at 3. Despite knowing as much, there are repeated instances where Affiant failed to reveal the same to the issuing magistrate judge.

approved of by HTD, was being promoted and used during the Affiant's investigation. Thus, only matters related to that second plan were relevant to the magistrate judge's consideration.

In addition to the Affiant relying on his unsubstantiated beliefs, stale and irrelevant information, and a false or incorrect presentation of how the BPPs worked, Defendants assert that the Affidavit contains material misrepresentations and omissions in violation *Franks v. Delaware*, 438 U.S. 154 (1978), which so undermine the Affidavit that a finding of probable cause is impossible. As noted above, they argue certain of the Affiant's conclusory representations about the insurance component of the BPP were false. Moreover, the Affiant failed to reveal fully numerous representations by Defendants and/or their representatives attesting to the lawfulness and legitimacy of the BPPs. Most significantly, they urge the Affiant willfully concealed from the issuing magistrate judge the written opinions of a prominent tax law firm that confirmed the legality of the BPPs. These omissions are critical in light of the government's concession as to the lawfulness of the opinions rendered by HTD. By those opinions, as well as the prior Lord Bissell opinion, the BPP then being promoted allowed for lawful business deductions under the Internal Revenue Code ("IRC"). Despite being aware of the December 2003 HTD opinion and possessing copies of the February 2004 summaries of same, the Affiant willfully failed to provide them to the magistrate judge. The summaries reveal HTD's rationale and the conclusion that the BPP was lawful under U.S. tax law; that the insurance components of the plan were legitimate; and the premiums paid for the policy under the BPP were more likely than not deductible under IRC §162. (*See* copies of

the summary opinions at Docs. 121-2 through 4).  The willful failure to provide such to the magistrate judge was a material omission under *Franks v. Delaware*.[7]

As evidence of another *Franks* violation, Defendants cite the Affiant's statement that Lord Bissell "withdrew" its favorable opinion of the BPP after learning that one or more of the co-conspirators had made material misrepresentations when securing the letter.  (*See* Doc. 121-1 at ¶¶ 45, 89 and Doc. 121-1 at 63-65).  Defendants contend the statement was false because the Lord Bissell letter to Jonathan Christenbury did not state that the opinion was withdrawn nor did it assert that material false representations were made.  Rather, the letter stated, "[c]onsequently, if these and other representations were not true, we may be required to withdraw the Opinion."  (Doc. 121-1 at 64).  Further, the letter advised, "[i]n order to reach a definitive conclusion on this matter," Dr. Christenbury would have to produce additional information.  *Id.*  Moreover, the letter referenced the 2002 plan purchased by Christenbury (the BPP-I), not the HTD plan being investigated.  As such, the Affiant was aware or should have been aware that the BPP the government was investigating was the HTD-designed BPP, not the one purchased by Dr. Christenbury.  In any event, they claim the representations made

---

[7]Apart from failing to disclose this exculpatory information, as noted above, Defendants urge that Affiant and the government improperly conflate the two separate and distinct BPPs into a single plan.  They urge that the first BPP, in use from 2001 until September 2003, was designed by Lord Bissell.  When that firm terminated its representation, a second BPP was designed by HTD.  That "new" business protection plan was described in detail by HTD in its December 2003 opinion letter (Doc. 121-5) and in summary letters (Docs. 121-2 through 4), which depicted the business protection plan investigated by Affiant. Defendants urge that matters concerning the earlier scheme were not only irrelevant and stale but also misleading to the magistrate judge.

to the magistrate judge related to Dr. Christenbury were misleading, stale, and did not support probable cause to believe the current BPP was illegal.[8]

In sum, Defendants urge that the Affidavit lacked sufficient relevant facts to support that the BPP was illegal and that Defendants were violating the law.  Moreover, the Affiant willfully concealed from the magistrate judge material evidence of the schemes' lawfulness, which demonstrated the absence of probable cause, and withheld from the magistrate judge legal opinions attesting the legality of the tax scheme.  Having demonstrated willful, materially false representations and omissions that would preclude a finding of probable cause, the warrant should be invalidated and the fruits of the searches suppressed.

Moreover, they argue that in the circumstances of this case the good faith exception to the exclusionary rule enunciated in *United States v. Leon*, 468 U.S. 897 (1984), is inapplicable because the warrant was based on a deliberately or recklessly false affidavit and the affidavit was so lacking in an indicia of probable cause as to render any official belief in its existence unreasonable.  *Id.* at 923.

---

[8]Defendants further contend that the representations concerning "The North Carolina Physician" (Dr. Christenbury), at ¶¶ 81-95 of the Affidavit, misleading and stale as Mr. Donaldson's statement to Dr. Christenbury not to file claims was purportedly made in 2003. When Dr. Christenbury spoke with the Affiant in 2007, he did so only after obtaining an immunity letter, and, contrary to the Affiant's representation that Dr. Christenbury stated that the BBP policy was not real foreign insurance (¶ 81), he had previously informed the IRS in 2005 that the purpose of the foreign trust was for "real and legitimate business reasons, namely to establish a business protection-asset protection trust and to obtain business protection-malpractice insurance coverage so as to be able to perform lasik surgery procedures." (Doc. 121-24 at 16).  None of this information was provided to the issuing magistrate judge.

B.

In response to the Motion, the government maintains that: the Affidavit established probable cause for the searches; Defendants fail to demonstrate a *Franks* violation; and, even if the Affidavit lacked probable cause, both the good faith and inevitable discovery exceptions to the exclusionary rule apply.

More particularly, the government argues that the Affidavit establishes probable cause to believe that Defendants were engaged in a *Klein* conspiracy to defraud the United States in violation of 18 U.S.C. § 371.[9]  It urges that the detailed facts presented in the Affidavit demonstrated that the business protection policies sold under the BPP were primarily for the purpose of tax evasion.  Based on the information available to the Affiant, much of which came from statements by the Defendants and their co-conspirators, the BPP scheme was illegal because its primary and expressed purpose was the creation of a tax benefit.  Under the BPP, the premium, in an amount selected by the business owner, could be large enough to offset most of the taxable business income.  Apart from the fact that the amount of insurance selected by a client could be large enough to offset a client's taxable business income for a given year, the policy could be applied retroactively, and there was no genuine expectation that the policy holder would make claims.  Indeed, the policyholder had a substantial financial disincentive to make claims, and the insurance company did not maintain sufficient claims reserves for losses.  Moreover, after obtaining the benefit of a tax deduction, the client would

---

[9]A *Klein* conspiracy involves an agreement to defeat the IRS's lawful functioning and the failure to report income properly.  *See U.S. v. Kottwitz*, 614 F.3d 1241, 1264-65 (11th Cir. 2010); *U.S. v. Adkinson*, 158 F.3d 1147, 1154 (11th Cir. 1998) (citing *U.S. v. Klein,* 247 F.2d 908 (2d Cir. 1957)).

effectively receive 83%-85% of the premium back after it was "funneled" through several offshore entities controlled by the Defendants.  In light of these facts, the magistrate judge could reasonably conclude that the Defendants promoted and implemented an illegal scheme to evade taxes through deductions for sham insurance that were not properly deductible as a necessary business expense under IRC § 162.

The government also urges that the Motion depends, in large part, on events that occurred after the warrants were issued.  And, they claim Defendants repeatedly misstate the government's position on the HTD opinions.[10]  As for the Affiant's statement that no claims had been filed or could be filed, Defendants do not demonstrate that such was knowingly or recklessly false in light of the information then-known to the Affiant.  And, as stated later in the Affidavit, a BPP client (Dr. Christenbury) told the Affiant that he was advised that making insurance claims was not the purpose of the BPP (Doc. 121-1 ¶¶ 87, 93).  As for the claim that the Affiant falsely characterized the September 12, 2003, Lord Bissell letter as "withdrawing" its approval of the BPP, even if such was a mischaracterization, it was not intentionally or recklessly so, given that the letter itself was attached for the magistrate judge's review.  Furthermore, as a part of a magistrate judge's consideration of probable

---

[10]Here the government cites its response in opposition (Doc. 93) to Defendants' second motion in limine to clarify its position that it does not claim the opinion letters themselves are sham or fraudulent opinions.  While the Affiant may have asserted such opinion, the government does not now take that position.  But, to the extent that such opinions were based on misrepresentations by Defendants and thereafter acted upon by Defendants, it does claim sham and fraudulent conduct.  By the government's argument, it believes that the opinion letters were secured and used by Defendants as tools to sell bogus tax shelters disguised as insurance policies.  To the extent that Defendants claim a contrary position taken by the government, they are wrong.  *See id.*

cause, he/she may rely upon reasonable inferences of an affiant.  Here, the Affiant provided his opinions and the facts underlying those conclusions, and such was entirely appropriate. Defendants' staleness argument fails because the Affidavit sets forth a long-term and ongoing criminal conspiracy to promote tax evasion schemes.

Regarding the alleged *Franks* violation, the government argues that Defendants fail to demonstrate that the Affiant recklessly or intentionally included specific false statements as required by *Franks*, nor do they demonstrate material omissions.  As for the omissions asserted in the Wisnovksy affidavit, the government asserts that it was not necessary to include each and every conversation from the undercover investigation in light of the matters which were revealed by the Affiant.  It specifically cites ¶¶ 20, 23(iii), 23(vi), 30, 36(I), 40(I), 40(vi), 41, 47, 49, 55, 63, 71, and 79 of the Affidavit, urging that these arguably exculpatory matters were included.  Such precludes any argument that the failure to include other such statements made a material difference to the probable cause determination.  The self-serving opinions by the conspirators that the BPP was lawful was not a material omission because it was reasonable for the magistrate judge to conclude that it was in the financial interests of those persons to assure potential customers that the strategy was legitimate.  And, common sense dictates that such a scheme would not be successful if it were advertised as an "illegal tax scheme."  As for the Affiant's stated opinions or beliefs, even if such were wrong, without more, such were not rendered recklessly nor were they intentionally false.

Contrary to Defendants' allegations, the government contends that the Affiant did not conceal the legal opinion letters.  Thus, the Affidavit referenced the Lord Bissell letter (at ¶ 86) and included as an exhibit the letter from Lord Bissell alleging misrepresentations (Doc.

121-1 at 63-65).  Moreover, the Affidavit referenced the fact that HTD attorney James

Duggan claimed to have authored opinion letters for the insurance and BPP (*id.* at ¶ 49).

While the undercover agents had received the three summary letters, the IRS did not have the

full HTD opinion at the time the Affidavit was executed.  Moreover, the government asserts

that even if the summary letters were included in the Affidavit, they would not have defeated

probable cause.  Nor would the correspondence attached to the Motion as Exhibits H, I, and J.

(Docs. 121-22 through 121-24).  And, even if Defendants established the first requirement of

*Franks*, the Affidavit, even if redacted to remove the specific alleged false statements or

modified to include the alleged omissions, would still support a finding of probable cause.  In

sum, the Affidavit supplied adequate probable cause of an ongoing *Klein* conspiracy.

Alternatively, the government urges that while good faith reliance on counsel is a

potential defense, the Affidavit provided sufficient evidence for the magistrate judge to

conclude that the co-conspirators were not acting in good faith in their implementation of the

scheme.  Because the agents reasonably relied upon search warrants issued by a detached

magistrate to conduct these searches, the good faith exception to the exclusionary rule

applies, and the Motion should be denied on this basis as well.[11]

## II.

The Fourth Amendment establishes that "no Warrant shall issue, but upon probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched,

and the persons or things to be seized." U.S. Const. amend. IV.  Here, the Defendants

challenge the requirement for probable cause.  In particular, they claim that the Affidavit in

support of the search warrants at issue failed to established probable cause to believe that the

Defendants were engaged in unlawful conduct.

In dealing with probable cause, "as the very name implies, we deal with probabilities.

These are not technical; they are the factual and practical considerations of everyday life on

which reasonable and prudent men, not legal technicians, act.  The standard of proof is

---

[11]The government makes the additional argument that the evidence seized under these warrants would have been inevitably discovered because grand jury subpoenas were issued contemporaneously with the searches of the offices and would have resulted in the production of an even broader class of records.  A separate subpoena to Fidelity Insurance Co., Ltd, was served in August 2007.  Because the government had an ongoing investigation, it would have discovered the seized records regardless of the allegedly illegal searches.

In its reply, Defendants assert that the inevitable discovery exception is inapplicable in this case because the government was not "actively pursuing" service of the grand jury subpoenas until one week after the search.  They further claim that the grand jury subpoenas did not seek the BPP records that were the subject of the search warrants and thus the records would not have been discovered.  (Doc. 145).  In its sur-reply, the government points out that the challenged searches were conducted on May 9, 2007, not May 2, as Defendants erroneously claim, and thus the grand jury subpoenas were issued prior to the search warrants and the inevitable discovery exception applies.  (Doc. 151).

I decline to reach the inevitable discovery dispute on this Motion as there are disputed issues of fact which must be resolved assuming this point in the Fourth Amendment analysis is reached.  Should that be the case, an evidentiary hearing will be conducted, unless otherwise ordered by the district judge.

accordingly correlative to what must be proved." *Brinegar v. U.S.*, 338 U.S. 160, 175 (1940). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Id.* (internal quotations omitted).  Thus, probable causes exists when the facts and circumstances within an officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been of is being committed. *Id.*; *Carroll v. U.S.*, 267 U.S. 132, 162 (1925)).

As now applied, "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).  Thus:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for … conclud[ing]' that probable cause existed.

*Id.* at 238-39 (citing and quoting in part *Jones v. U.S.*, 362 U.S. 257, 271 (1960)).

On the matter of staleness, the law requires that in order to satisfy the probable cause standard, "the government 'must reveal facts that make it likely that the items being sought are in that place when the warrant issues.'" *U.S. v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (quoting *U.S. v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985).  That is, for probable cause to exist, the information supporting of the government's application for a search warrant must be timely.  In reviewing a staleness challenge, courts do not apply arbitrary time limitations, but

instead review each case based on the facts presented.  "In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched."  *Harris* at 450. (cases collected).  When the affidavit recites an isolated violation "then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time.  On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance."  *U.S. v. Bervaldi,* 226 F.3d 1256, 1265 (11th Cir. 2000) (citing *U.S. v. Bascaro*, 742 F.2d 1335, 1345-46 (11th Cir. 1984) (quoting *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973)).  Moreover, even stale information does not void an affidavit when the government's affidavit updates, substantiates, or corroborates the stale information.  *U.S. v. Galloway*, 579 F. App'x 871, 873-74 (11th Cir. 2014) (citing *Harris*, 20 F.3d at 450) .

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that:

> Where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155-56.

Affidavits supporting warrants are presumptively valid.  *U.S. v. Lebowitz*, 676 F.3d 1000, 1010 (11th Cir. 2012).  "[I]ntentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."  *Id.* (quoting *U.S. v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009)).  Thus, under *Franks*, a defendant must carry his burden of proving that (1) the affiant knowingly or recklessly made the alleged misrepresentations and/or omissions, and (2) excluding the alleged misrepresentations and/or including the alleged omissions would preclude a finding of probable cause for issuance of the warrant, i.e., the misrepresentations and/or omissions were material.  *U.S. v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001); *U.S. v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990).

"When assessing whether the alleged false statements and omissions were material, the trial court is to disregard those portions of the affidavit which the defendant has shown are arguably false or misleading."  *Kapordelis* at 1309 (citing *Franks* at 171-72).  "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.  Looking only at the remaining portions of the affidavit, the court will then determine whether including the omitted facts would have prevented a finding of probable cause."  *Id.* (quotations omitted).  If probable cause still exists once the misrepresentations are taken out of the warrant and the omissions are inserted, there is no need for a hearing and no *Franks* violation.  *U.S. v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013); *Lebowitz,* 676 F.3d at 1010-11.

III.

A.

First, it bears repeating that the duty of a reviewing court in these matters is simply to ensure that the issuing magistrate judge had a substantial basis for concluding that probable cause existed.  Defendants' near-microscopic examination of components of the Affidavit, pursued with the benefit hindsight, goes well beyond the review this Court must conduct. That being said, the Defendants' arguments are addressed in some detail herein.

Putting aside for the moment any question of the veracity of the Affiant's statements and the significance of any omissions, a fair reading of the Affidavit gives rise to the conclusion that it establishes probable cause to believe Mr. Crithfield and others were promoting and implementing an illegal tax evasion scheme allowing for improper business deductions under IRC § 162.  As discussed below, while Defendants demonstrate some legitimate criticism of the relevance, staleness, and inaccuracy of certain of the Affiant's representations and opinions, I find the Affidavit more than adequate to permit the conclusion that Defendants were then-presently engaged in an illegal conspiracy to obstruct the lawful functioning of the IRS through the promotion and implementation of the BPP.

I do agree with Defendants that the Affidavit contains certain statements on matters that were irrelevant to the probable cause determination – either because of their very nature or because they related to events so dated that they could not properly be considered to reflect on the scheme under investigation.  For example, in the "General Background" section of the Affidavit (Doc. 121-1 at 3-8), there are a number of representations that perhaps offer historical information of the IRS's long-held suspicions of Mr. Crithfield and entities he was

18

associated with, but that simply do not speak to any alleged current criminal conduct. Allegations dating to 1996 concerning an IRS investigation of Mr. Crithfield that revealed no illegal activity do not speak to the issue of probable cause; nor does the fact that he possessed a pilot's license and traveled by air to the Caribbean in 2001-02. The fact that he had to file delinquent tax returns for income during 1994-97 appears completely unrelated to the investigation being conducted by the Affiant. Similarly, allegations from an unidentified source accusing Arthur Boelter, Esq., of being a "crook" and being involved in unsubstantiated illegal activities in 2001 do not speak to the probable cause issue either. However, these representations are a very small part of the matters presented to the magistrate judge and provide a wholly insufficient basis for concluding the Affidavit lacked probable cause.

I think Defendants are also correct that the Affiant paints with a broad and conclusory brush by referencing undated and unsubstantiated IRS Lead Development Center ("LDC") reports as a source of information, which purportedly identify Defendants and related entities as "abusive offshore scheme promoters" and by accusing anyone associated with the BPPs, including experienced tax attorneys and a former IRS regional executive, of being "co-conspirators" in the illegal scheme. Such labels are no substitute for facts. Nonetheless, I think it the reasonable conclusion that these characterizations do not preclude a probable cause finding when the whole of the Affidavit is considered. In the first place, the Affidavit moves well beyond these unsubstantiated statements in terms of describing the suspected illegal conduct. Moreover, I am confident that an experienced magistrate judge would recognize the unsubstantiated LDC reports as providing nothing more than grounds for

19

suspicion of illegality and the loose labeling of individuals as co-conspirators as the Affiant's advocacy and nothing more.  In any event, the Affidavit provided much more than this window-dressing.

As for Defendants' complaint that the Affiant relied on his unsubstantiated conclusions of illegality that cannot substitute for facts necessary to support a probable cause finding, the argument ultimately fails.  It is correct that the Affiant asserted that the BPP scheme was an "illegal tax scheme," that the insurance component was "sham insurance" and "unnecessary," and that the resulting deduction was also a "sham."  Because such assertions of illegality are unsupported by facts and simply incorrect (even false) in light of HTD's approval of the BPP, Defendants urge that these matters could play no part in the probable cause calculus.  However, I think a fair reading of the Affidavit reveals adequate factual support for the conclusions to allow for the magistrate judge's independent determination of probable cause, even in light of the HTD opinions.

A reviewing magistrate may not rely upon bare conclusions of others in finding probable cause.  Rather, the affiant must supply the magistrate with a substantial basis for determining the existence of probable cause.  *United States v. Leon*, 468 U.S. 897, 915 (1984).  Thus, blanket assertions that the BPP scheme was an "illegal tax scheme," or that the insurance component was "sham insurance" and "unnecessary," and the labeling of the participants as "co-conspirators," could not alone suffice to support a probable cause determination.  However, the Affidavit as a whole did otherwise provide the magistrate judge relevant facts and a rationale for the Affiant's conclusions as to the illegality of the scheme and the reasons for discounting the insurance aspect of it.  And, as discussed in more detail

below, when considered in full, the Affidavit gave the magistrate judge an adequate factual

basis to permit his independent decision about the legality of the scheme being promoted.  *See*

*Massachusetts v. Upton*, 466 U.S. 727, 734 (1984)*; U.S. v. Jenkins*, 901 F.2d 1075 (11th

Cir.1990); *United States v. Robinson*, 62 F.3d 1325, 1331 n. 9 (11th Cir.1995) ("[O]pinions

and conclusions of an experienced agent regarding a set of facts are properly a factor in the

probable cause equation [for issuing a search warrant]."  Moreover, the loose characterization

of all involved with Defendants as "co-conspirators," even if condemnable, is not at all fatal

to the probable cause decision.[12]

On the issue of staleness, while there are matters set forth which appear too dated to

be relevant, I find a number of the events complained of relevant to the magistrate judge's

consideration.  Here, it is significant that the Affiant alleged an ongoing conspiracy involving

the Defendants' promotion and implementation of tax evasion schemes employing business

risk policies from at least 2001.  While Defendants urge that the earlier business protection

plan was different from the one being investigated by the Affiant and therefore wholly

irrelevant to the investigation, such is not well-demonstrated on this Motion.  Even if different

in certain details, the two BPPs appear similar in a significant way based on their respective

use of business risk insurance as the means of generating a tax deduction.  And, even if the

applicable statute of limitations rendered such earlier conduct beyond the reach of the law, I

find the Affidavit demonstrates long-term and ongoing efforts by Defendants and their

---

[12]Defendants note that government counsel now declines to condemn the attorneys as co-conspirators, conceding instead the *bona fides* of their opinions.  Even so, the use of such labels is common to search and arrest warrant affidavits and always merits consideration by the reviewing magistrate only to the extent supported by the allegations of wrongdoing.

affiliated entities to sell asset protection and tax reduction schemes that were relevant to the magistrate's consideration.

Here, the whole of the Affidavit reasonably suggested an ongoing conspiracy. Thus, evidence concerning the similarity in the schemes; information concerning the Defendants' long-term promotion of business tax deductions for business risk insurance policies; evidence concerning Lord Bissell's approval of the BPP and later questioning of same; and the anecdotal evidence related to Dr. Christenbury's experience with the BPP was appropriate for and relevant to the magistrate judge's consideration.[13] Not only did such provide historical background on the Defendants' promotion of the BPP, it gave practical insight to the magistrate judge's consideration of the insurance component of the BPP being investigated by the Affiant.

Moreover, Defendants cannot now tout the legality of the BPPs by noting that such were approved of by the tax law firms and simultaneously complain about the Affiant's reference to the Lord Bissell letter indicating the firm's doubts about its legality. Defendants' argument imposes a wall between conduct under the Lord Bissell BPP and the HTD BPP such that the earlier matters could not support the probable cause determination. The government rejects any claim that there are significant differences between the BPPs. I find insufficient facts presented to resolve this dispute over differences between the BPP approved by HTD and the BPP approved by Lord Bissell. Even accepting that the BPPs were different in some particulars, reference in the Affidavit to evidence from Lord Bissell and Dr. Christenbury,

---

[13]Dr. Christenbury is identified as the "North Carolina Physician" in the Affidavit (Doc. 121-1 at 26).

which called into question the efficacy of the business risk insurance policy as a means to obtaining a legitimate tax deduction, was proper and relevant for the magistrate judge's consideration. While this evidence from the early 2000s alone would not be sufficient to warrant a probable cause determination for a search in 2007, these matters were not stale or irrelevant as urged.

The import of the legal opinions supporting the legitimacy of the BPPs is discussed in some detail below. But, suffice it to say that I agree with Defendants that such opinions should have been presented in a forthright manner. By my reading, the opinions of HTD were given notably short shrift. However, HTD's (and others') approval of the BPP is fairly inferred by the information provided by the Affiant, including reference to attorney Duggan's statements to the undercover agents that he wrote the opinions for the insurance policies and the BPP and that he was a client of the offshore trust program. (*See e.g.* Doc. 121-1 at ¶¶ 23(iii), 41(ii), 44, 49). As urged by the government, it defies common sense that such was included to suggest that the tax attorneys wrote opinion letters finding the policies illegal. And, such would not be lost on an experienced magistrate judge reviewing the Affidavit. In any event, the legal opinions of Lord Bissell and HTD do not *ipso facto* reveal the BPPs to be a lawful scheme, and neither was binding on the magistrate judge's consideration.

The Affiant presented information gleaned from promotional materials supplied by Defendants or affiliate entities and communications with Defendants and their representatives during the undercover investigation to articulate facts and circumstances demonstrating that Defendants promoted and implemented a scheme for asset protection, wealth management, and tax avoidance. The scheme offered individuals a means of sheltering and protecting

23

assets and at the same time a means for taking significant business deductions on U.S. tax returns.  As was openly acknowledged by Defendants or their representatives, although insurance was a necessary component of the overall scheme, first and foremost, the BPP was about asset protection and tax relief and not about insuring risk.  The Affidavit accurately reveals that, as promoted, the amount of business risk insurance purchased was determined by the business owner based on the size of the deduction he/she desired and not on the basis of any particular amount of insurance needed.  The insurance was selected by the business owner from a menu of business risk policies which, as Defendants insists (apparently correctly), are the type approved by the IRS.  But, as such was promoted, the business owner was encouraged to insure against a risk that was conceivable to his/her circumstances but unlikely to occur.  And, as illustrated by the Defendants, the fullest benefits under the BPP were obtained when no claims were made against the insurance.  Thus, from the outset, the business owner was incentivized not to make claims against the insurance so as to enjoy the greatest investment benefits and return.  Included in the full benefits for those who did not make claims against the business risk policy was the opportunity for the business owner to recover about 85% of the premium paid from the cash value of the life insurance component of the scheme.  Such loan was without any tax consequences either.  Little, if any, risk was transferred to the insurer of the business risk policy, as claims were not likely to be made and the insured's own monies were in place to pay any claims.  Notwithstanding the assurances of Defendants and others that the scheme was IRS-compliant and notwithstanding the existence of favorable legal opinions, the magistrate judge could conclude that the scheme promoted and permitted illegal tax evasion based on the primary goal of such business expenditure; the

24

improbable nature of the risks assured against; the lack of significant risk being shifted to the insurer; the fact that the amount of insurance purchased was determined by the size of the tax deduction sought and not by the amount of the insurance needed; by the fact that the scheme discouraged claims and offered its greatest benefits when the insured made no claims against the policies; and among the full benefits was the opportunity to recover about 85% of the premium costs each year.  The emphasis on gaining a business tax deduction, the disincentive for bringing claims, and the timely return of almost all of the premium costs to the business owner without tax consequences would support the magistrate judge's conclusion that the business risk insurance component was illusory and not an ordinary and necessary expense under IRC §162.  That conclusion would support the probable cause finding that Defendants promoted the false reporting of business expenses and income on U.S. business tax returns in violation of 18 U.S.C. § 371.

B.

Insofar as Defendants invoke *Franks v. Delaware* and urge that the Affiant made material misrepresentations of fact and otherwise omitted facts undermining the probable cause finding, the argument is based on the Affiant's failure to reveal more of the Defendants' and representatives' statements concerning the legality of the BPP recorded during the undercover investigation and the failure of the Affiant to reveal more fully the legal opinion of the HTD firm and provide the magistrate judge with a copy of the opinion or at least the summaries of the same in the agent's possession.

Concerning the alleged false statements, Defendants again cite: the Affiant's representations that the BPP was an "illegal tax scheme;" that the insurance component was

25

"sham insurance" and "unnecessary;" the Affiant's stated belief that "no claims have or can be filed;" that tax deductions under the BPP were a "sham" because the premium expense was not an ordinary and necessary expense; that co-conspirators "funneled" 85% of the purchase premium back to the business owner via offshore transactions for the owner's tax-free use; and also, the Affiant's statement that Lord Bissell had withdrawn its approval of the BPP due to purported misrepresentations.  Defendants argue each of the misrepresentations are all demonstrably false as shown by the legal opinion of the HTD firm and the representations and explanations from Defendants, attorneys, a former IRS official, and others that the insurance component of the scheme was real insurance, offered by legitimate firms upon legitimate underwriting and at rates set by the insurer not the insured.  Contrary to the Affiant's allegations, potential investors were told that if they had claims, they should file them, and indeed had to file them, to be IRS compliant.  Moreover, there was nothing illegal about the investor receiving part of his investment as a lawful loan against the cash value of a life insurance policy.  And, contrary to what the Affiant said, Lord Bissell did not withdraw its opinion.  Given the actual representations made and HTD's approval letter, which the government now accepts as lawful, Defendants contend that these representations and conclusions by the Affiant to the contrary are necessarily false and completely undermine the finding of probable cause.

Moreover, the Affiant deliberately concealed the HTD firm's opinion letter from the consideration of the magistrate judge.[14]  Likewise, the Affiant concealed from consideration

---

[14]It appears the case that, while such was available, neither the Affiant nor the undercover agents obtained a copy of the full HTD opinion letter prior to submitting the

of the magistrate judge the "wealth" of materials and statements obtained in the undercover investigation that establishes the absence of probable cause.[15]  Had such been provided, a finding of illegality would have been precluded.

In this Circuit, in order to "attack the veracity of a warrant affidavit, a defendant must make a preliminary showing that the affiant made intentional misstatements or omissions (or made misstatements with a reckless disregard for their truthfulness) that were essential to the finding of probable cause." *U.S. v. Burston,* 159 F.3d 1328, 1333 (11th Cir. 1998); *see also U.S. v. Sims*, 845 F.2d 1564, 1571 (11th Cir. 1988).

After considerable review, I conclude the Defendants do not demonstrate that the Affiant made any intentional false statement in the Affidavit.  While it now appears that not all the Affiant's representations were correct, I think it the proper conclusion that the incorrect statements were not made with reckless disregard for the truth.

As noted, as proof of the falsity of the Affiant's statements, Defendants chiefly rely on the contrary opinions of the HTD firm.  By their argument, because the government now

---

Affidavit.  At that time, however, the undercover agents had been provided copies of February 2004 summary opinions given to Mr. Crithfield as President of Fidelity Insurance Co., LLC. ("Fidelity").  In these three summaries, HTD gave its opinion on U.S. tax issues under the business risk policies being issued by Fidelity; its opinion on U.S. tax issues concerning the variable life insurance policies being issued by Fidelity; and its opinion on U.S. tax issues concerning the variable annuity policies being issued by Fidelity. (*See* Docs. 121-2, 121-3, and 121-4, respectively).  In general, the summaries supported the legality of each under U.S. tax law and, in the first, the conclusions that the business risk policies were more likely than not "insurance" as defined by U.S. law, that premiums paid for the business risk policies are ordinary and necessary expenses under IRC §162, and that deductions for the premiums paid would be allowed in the year of payment.

[15]*See* affidavit of George Wisnovksy.  (Doc. 121-7).

27

accepts the *bona fides* of the legal opinion, any conclusory statements by the Affiant to the contrary of the legal opinion are simply false.  I cannot agree.  By my consideration, the HTD firm's legal opinion was just that – an opinion – solicited by Fidelity for use in promotion of the BPP.  While I agree that the summary opinions or some explanation of them should have been provided the magistrate judge, the summaries are read, at best, to provide a qualified opinion that more likely than not the business risk policies sold by Fidelity were "insurance" as defined by U.S. tax law, and, as so viewed, the costs of the policies were more likely than not deductible under IRC § 162 as ordinary and necessary expenses.  While these qualified conclusions are contrary to the Affiant's, they do not necessarily render his opinions intentionally or recklessly false.  Nor would they be controlling on the magistrate judge's consideration, especially under the probable cause standard at play in his consideration of the warrant applications.  That conclusion is not altered by the fact that the government now does not challenge the *bona fides* of the opinions.[16]

Moreover, while the Affidavit reflects the considerable advocacy by the Affiant and less-than-full disclosure regarding representations by the Defendants and those representing them, there is no clear demonstration that the Affiant knowingly and intentionally included

---

[16]This conclusion is a comment on the legality of the BPP scheme only in the context of the probable cause standard at play on these applications for search warrants.  While the Affiant denominated numerous foreign entities as well experienced tax lawyers and a former official of the IRS who approved and touted the scheme as co-conspirators, the government declines presently to do so and it concedes the *bona fides* of the legal opinion issued by the HTD law firm.  It maintains that Defendants nonetheless violated the law, but it would appear that if the scheme promoted and implemented by Defendants is the scheme approved of by HTD, a matter not determinable on this Motion, it is questionable that the government can then claim Defendants' conduct illegal.

false statements in the Affidavit.  As discussed above, Defendants here demonstrate that certain statements concerning the business risk policies were conclusory and/or incomplete and thus not entirely accurate.  But the Affiant's central premise was that the BPP promoted the purchase of "bogus" insurance in order to obtain tax relief.  The insurance was "bogus" because the primary focus of the transaction was not on whether it was necessary to the company but on how it could be used to artificially lower the profits of the company in order to reduce its tax debt.  Even if the Affiant was wrong and/or incomplete in his description of the insurance component, the premise of illegality remained accurately addressed when the whole of the Affidavit is read.[17]  As for the alleged false statements concerning Lord Bissell's withdrawal of its approval of the BPP due to material misrepresentations (Doc. 121-1 at ¶ 89), when the whole of the Affiant's representations about Lord Bissell, attorney Comiskey, Mr Christenbury, and the referenced letter are read (*id.* at ¶¶ 81-95 and pp. 63-65), the magistrate judge was not misled.  Lord Bissell did ultimately withdraw its approval for the BPP out of

---

[17]The Affiant's description of the business risk insurance appears overly simplistic and somewhat misleading insofar as he represents that premiums were set by the insured, not the insurer, and that the insurance was "not functional" and a "sham" because no claims had or could be filed against the policy.  (Doc. 121-1 at 2-3).  It now appears the case that insurance policies were provided after some measure of underwriting to assure against some form of business risk and that claims could be and were filed against such policies.  The suggestion that the business owner determined the amount of the premium is accurate only in the sense that the business owner determined the amount he wished to spend on coverage.  Rates appear to have been determined by the insurer.

Even if inaccurate, this description necessarily is read in the context of the whole Affidavit, which includes a more complete and accurate statement of how the scheme was intended to work based on material received, such as the marketing material of Foster & Dunhill.  *Id*. at 24-25, 46-61.  When the Affidavit is read as a whole, the magistrate judge could credit Affiant's central premise that the insurance being purchased was not necessary in contemplation of IRC § 162 and the scheme promoted illegal evasion of U.S. taxes.

concern for how it actually operated.  (*Id.* at ¶¶ 91-95).  As for the statements attributed to Dr.

Christenbury that the foreign insurance he purchased was not really insurance (*id.* at ¶ 81),

such is not shown to be false, even if it was obtained after a grant of immunity (which, as

Defendants complain, was not revealed to the magistrate judge) and even if a former attorney

of his made a different claim to the IRS in the doctor's behalf (Doc. 121-24).

Moreover, even if I were to conclude that Defendants are correct and the Affiant made

these representations in knowing or reckless disregard of the truth, I am unable to make the

next finding under *Franks* – that Defendants have shown that such statements were necessary

to a finding of probable cause.  When the whole of the Affidavit is considered, there is

enough information provided about the BPP and the insurance components to permit the

magistrate judge to conclude the Defendants were promoting a scheme to defraud the IRS,

irrespective of any erroneous conclusory assertions of illegality.

I find the allegations of material omissions by the Affiant somewhat more

problematic.  It is undisputed that the Affiant failed to address or otherwise provide to the

magistrate judge copies of the three HTD summary letters approving the insurance

components of the scheme.  In my view, either the summary letters themselves or a statement

explaining their substance should have been revealed to the magistrate judge.  Again, the

Affidavit reflects that the Affiant engaged in a notable amount of advocacy in disputing

Defendants' statements about the BPP and in urging the illegality of the insurance

components.  In light of such, the magistrate judge would have been better served with the

provision of tax counsels' rationale to the contrary that the BPP was a lawful means of tax

reduction.  That said, after considering the summary opinions, I am convinced that the

inclusion of a more complete statement of HTD's approval of the BPP or the submission of the summary letters themselves would have made little or no difference to the finding of probable cause and surely would not have precluded the finding.

As discussed above, the summary letters revealed qualified, "more likely than not" opinions of counsel hired by Fidelity for the obvious purpose of rendering a legal opinion that would be used to market the BPP.  Given that the Affidavit is reasonably read to reveal that the two law firms rendered favorable opinions concerning the BPPs, the addition of these qualified opinions would have had no real impact on the probable cause determination.  While the Defendants now assert the absolute authority of the HTD opinion in light of the government's concession that such was a lawful opinion, the opinions were not binding on the magistrate judge's probable cause finding.  Stated otherwise, the magistrate judge was free, on the facts presented, to conclude that, more likely than not, the insurance component of the BPP was indeed a sham employed as a means to claim a business tax deduction not otherwise permitted under IRC § 162.  Thus, it is my conclusion that, in the given circumstances, even if the summary opinions had been presented to the magistrate judge, such would not have altered the magistrate judge's conclusion on probable cause.

Defendants also cite numerous recorded statements and representations made by Defendants or those acting on their behalf during the undercover investigation who attested to the legality of the scheme, the legitimacy of the insurance, the necessity for IRS compliance, and the lawfulness of the tax deduction, all of which were omitted from the Affidavit.  They urge that had these statements been presented, such would have precluded a finding of probable cause.  In support, they proffer the Wisnovsky affidavit (Doc. 121-7), the substance

of which is not controverted by the government. As demonstrated therein, the undercover agents and other prospective clients were privy to the repeated refrains that the BPP had been fully reviewed and approved by counsel, was IRS compliant, and a legitimate means of reducing taxes. Thus, as asserted by Mr. Wisnovsky, on a number of occasions the undercover agents were advised that the BPP insurance components were real and had to be real to be IRS compliant. Moreover, they were advised that IRS reporting was necessary. Significantly, as outlined by Mr. Wisnovsky, there were a number of representations by Defendants or their representatives that more fully described the insurance component of the scheme and that clearly cast doubt on Affiant's simplistic take on the same. Thus, investors, including the undercover agents, were told that the insurance was sold at market rates, using a third-party underwriter, that Fidelity did assume some of the risk of loss, and that re-insurance was a component of the scheme. Also, in more than one discussion, it was stated that claims against the policies should be filed to avoid questions about the insurance. These discussions, which arguably lent credibility to the BPP, supported that the insurance was real, and contradicted representations by the Affiant, were not included in the Affidavit.

I find the failure of the Affiant to reveal a fair quantum of these representations supporting the legality of the BPP reflects some lack of candor on his part. While the Affiant had no obligation to include each and every statement heard during the undercover investigation, he was duty-bound not to mislead the court. As noted, the Affiant engaged in considerable advocacy to support his opinion and given the contrary HTD opinions and the omitted representations regarding the insurance component of the BPP, it appears his explanation of the insurance component was skewed to support his position. That said, I

again conclude that the omission of some or all of the statements highlighted by Defendants would not have precluded the finding of probable cause.

It is clear from the Affidavit that Defendants sold the BPP as a lawful and effective way to shelter assets and to obtain tax relief and that a prime vehicle for accomplishing this was through insurance.  While the Affiant's observations and simplistic explanation about the insurance were less than complete, the Affidavit otherwise sets forth a clearer picture of the components of the scheme and how it was intended to work.  (*See id.* at ¶¶ 79-79; 46-61).  And, even without being provided all the details, common sense dictated the conclusion by the magistrate judge that the attorneys and the ex-IRS executive who spoke on behalf of the BPP were touting the scheme as lawful and IRS compliant.  *See, e.g., id.* at ¶¶ 35-36, 41, 44, 47, 49, and 69.  Thus, I think the inclusion of repeated statements to that effect would not have altered the probable cause finding.  The fact that the policies were real policies underwritten by Fidelity, sold at market rates, and backed by reinsurance would not dictate a different conclusion that the BPP allowed for the under-reporting of business income based on a business deduction that was not an ordinary and necessary expense under IRC § 162.  The omissions here complained of would not have affected the probable cause conclusion of the magistrate judge.  No further relief is called for on the *Franks* claims.

IV.

In conclusion, the search warrants at issue on this Motion were issued consistent with the prescriptions of the Fourth Amendment.  The warrants issued on an adequate showing of probable cause to justify the searches, and Defendants do not otherwise challenge the

locations searched nor the scope of the search.  It unnecessary to reach the arguments related

to the good faith exception.

For the foregoing reasons, it is **RECOMMENDED** that **Defendants' Motion to**

**Suppress - Searches and Incorporated Memorandum of Law** (Doc. 121) be **DENIED**.

Respectfully submitted this
11th day of February 2015.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations

contained in this report within fourteen (14) days from the date of its service shall bar an

aggrieved party from attacking the factual findings on appeal and a *de novo* determination by

a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R.

Civ. P. 6; M.D.Fla. R. 4.20.

Copies furnished to:
The Honorable Steven D. Merryday, District Court Judge
Counsel of Record

34