UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


UNITED STATES OF AMERICA

v.                                                    CASE NO. 8:13-cr-237-T-23TBM

DUANE CRITHFIELD
STEPHEN DONALDSON, SR.
_____/


**ORDER**

In the superseding indictment (Doc. 47), the grand jury charges Duane

Crithfield and Stephen Donaldson with one count (count one) of conspiracy to

defraud the United States and two counts (counts two and three) of willfully aiding

the submission of a "false and fraudulent" income tax return.  According to the

superseding indictment, to achieve the unlawful objects of the conspiracy Crithfield,

Donaldson, and the unindicted conspirators "promoted, marketed, and

implemented" a "Business Protection Plan," consistently designated "the BPP,"

which was purportedly a lawful, insurance-based tax shelter but which was actually a

fraudulent mechanism to defeat the federal income tax.  (Doc. 47 at 3)  With the

United States' consent (Doc. 277 at 2), each defendant waived (Doc. 191) the right to

a jury trial.

**FOREWORD**

The United States accuses two men, along with several unindicted conspirators, of hatching and implementing a plot to convert into an intoxicating profit for themselves the aspirations of their high-income customers to protect that high income from federal taxation.  So far as the evidence shows, the taxpayers in this venture were mostly honest, educated, and experienced professionals and entrepreneurs, who retained lawyers, accountants, and other skilled advisers to ensure both the effectiveness and the lawfulness of the taxpayers' management of money.  Consistent with the considered judgment of their advisers, these taxpayers purchased at a steep cost a set of fantastical and superfluous "insurance" policies and in return re-captured control of cash equal to about 85% of the premium paid for each policy.  In other words, the taxpayers accepted the notion that they could reduce the effective, maximum, marginal-income tax rate from about 40% to about 15% by signing a few papers and moving money from here to there, from there to who knows where, and then back again.

That these mostly honest, educated, and experienced taxpayers and their savvy advisers believed in, and committed money to, this criminal scam presents an irrefutable and deafening reminder of the extent of the public's cynicism toward the federal income tax code — a bloated and opaque monstrosity.  In other words, as the present episode evidences, almost no financial scheme is so suspicious or so

- 2 -

implausible that a good salesman cannot convince an honest and vigilant taxpayer that the Internal Revenue Service is prepared to award tax relief to a participant. But for the adulteration of the public's regard for the Internal Revenue Code, the charged crime might have been impractical for the compelling reason that no fair-minded and honorable person would have thought for a moment that the scheme would succeed. Apparently, when the subject under consideration is the federal income tax code, no enormity is unthinkable and no promise is unutterable.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. The BPP

#### A. The structure

Beginning in the 1990s, Crithfield and Donaldson established a commercial enterprise that sold the BPP to closely held businesses. Donaldson promoted and sold the BPP. Crithfield was an owner, director, or officer of several of the offshore entities that constituted the enterprise.[1] From 2001 to May 2007, the enterprise sold the BPP, a labyrinthine edifice, which, once the overt distractions and shadowy deceptions are penetrated, amounts to a markedly simple scheme.

Under the BPP, a closely held business paid a premium to an insurance company for a purported insurance policy and deducted from the business's taxable income an amount equal to the premium. The enterprise collected a fee, which was a

---

[1] (Exs. 1C, 49-A, 62-T, 77-T-1, 221-1a1)

percentage of the insurance premium, a percentage much smaller than the business's normal marginal tax rate. At the end of the year (during which, according to the shared understanding, the business submitted no claim under the policy), the enterprise transferred to the business owner's control nearly all of the insurance premium — untaxed. The defendants' enterprise collected a fat fee. Because the business owner deducted as an "ordinary and necessary" business expense the part of the business's taxable income diverted to the insurance premium and returned to the business, the United States collected nothing.

At presentations promoting the BPP, Donaldson identified the BPP's "strategic goals" as reducing business or personal income tax, reducing capital gains tax, protecting assets, and creating tax-free retirement income. The defendants' enterprise accomplished these goals in three phases. First, under an agreement with First Fidelity Trust, the owner of a closely held business established an offshore trust. Often, the business owner was the trustee, and the business owner or the owner's children were the beneficiaries. Second, under an agreement with Fidelity Insurance Company or Citadel Insurance Company, the trust bought an annuity or a cash-value life insurance policy, which named as a beneficiary the owner or the owner's children. The defendants' enterprise allocated the premium paid for the life insurance policy (the policy's cash value less fees) to an account segregated from the accounts attributable to the life insurance policies owned by the enterprise's other

- 4 -

customers.[2]  Third, the owner's business bought from Fidelity Insurance Company or Citadel Insurance Company an insurance policy, which purported to cover a specified business "risk," and the business deducted — as an "ordinary and necessary" business expense — an amount equal to the premium from the business's taxable income.  Absent a claim during the policy's one-year term, the enterprise subtracted a fee[3] from the premium and transferred the remaining premium to the life insurance policy's segregated account, which the business owner controlled.  The financial result was simple and profound: 83% to 85% of the "insurance" premium returned tax-free to the business owner.[4]  In other words, the business owner — a high-income taxpayer — paid the enterprise about a 15% "fee" to avoid a much higher marginal income tax rate.  Quite the deal.

**B. The entities**

Formed in Anguilla in 1995,[5] Foster & Dunhill marketed the BPP and hosted offshore sales presentations for the defendants' current and prospective customers.

---

[2] (Tr. 346 (Babbel))

[3] Fidelity Insurance Company collects a 15% fee, and Citadel Insurance Company collected a 17% fee.

[4] (Tr. 346 (Babbel))

[5] Most entities in the defendants' enterprise operated in the British West Indies or in the Bahamas.

Donaldson was a director, the chairman, and the chief executive officer of Foster & Dunhill, and Crithfield was a director and an officer of Foster & Dunhill.[6]

Formed in St. Kitts and Nevis in 1995, Alliance Holding Company wholly owned First Fidelity Trust, Fidelity Insurance Company, and other entities in the enterprise. Crithfield was a shareholder and a director of Alliance. First Fidelity Trust, formed in St. Kitts and Nevis in 1995, sold offshore asset-protection trusts and administered the BPP's trusts. Crithfield was a director of First Fidelity Trust.[7]

Fidelity Insurance Company, formed in 1995, and Citadel Insurance Company, formed in 2005, sold the BPP's business-risk insurance policies, cash-value life insurance policies, and annuities. Crithfield was a director, the chairman of the board of directors, and until 2005 the president of Fidelity Insurance Company. Crithfield was a director and until 2006 the president of Citadel Insurance Company. Crithfield and Donaldson each owned 40% of Citadel Insurance Company. Beginning in 2005 David McNamee was the president of Fidelity Insurance Company, and beginning in 2006 McNamee was the president of Citadel Insurance Company.[8]

---

[6] (Tr. 342 (Frank and Brady); Tr. 344 (Salinski); Exs. 1C, 49-A, 62-T, 77-T-1, 455, 610, 611, 725)

[7] (Tr. 342 (Frank); Exs.1C, 62-T, 77-T-1)

[8] (Tr. 342 (Frank); Exs. 1C, 62-T, 77-T-1)

- 6 -

Formed in Florida in 1997, Offshore Trust Services performed accounting, administrative, and customer services for the defendants' enterprise.  Crithfield was a director of Offshore Trust Services.  Also, Crithfield's son, Josh, and Donaldson's son, Christopher, were directors of Offshore Trust Services.  From 2002 to 2005 McNamee was the president of Offshore Trust Services.[9]

### C. Risk distribution

In the BPP, Fidelity Insurance Company or Citadel Insurance Company purportedly transferred to another entity a percentage of the risk assumed under a business-risk policy.[10]  Federation Re (Fed Re), formed in 2000, served as the plan's purported re-insurer.  First Fidelity Trust partially owned Fed Re, and Donaldson's son, Christopher, was the president of Fed Re.[11]  After an insured business paid the business-risk policy's premium, Fidelity Insurance Company and Fed Re entered into a "re-insurance agreement," under which Fidelity Insurance Company purportedly ceded Fed Re 95% of the total risk of loss on the policy.  The life insurance policy's

---

[9] (Tr. 342 (Frank and Brady); Exs. 1C, 49-A, 52-T)

[10] Under a re-insurance contract, "one insurer for a consideration agrees to indemnify another insurer, either in whole or in part, against loss or liability, the risk of which the latter has assumed under a separate and distinct contract as insurer of a third party." *Couch on Insurance*, § 1:33 (3d ed. 2016).

[11] (Tr. 342 (Frank); Exs. 1C, 212-3m, 400, 611, 725)

segregated account purchased an interest in a limited liability company, and the LLC agreed to guarantee 80% of Fed Re's risk.[12]

As a result, Fidelity Insurance Company purportedly held 5% of the total risk of loss on the business-risk policy, Fed Re purportedly held 19% of the total risk, and the LLC, which is ultimately controlled by the business owner, purportedly held 76% of the total risk.  In return for the purported risk transfer, the standard agreement required Fidelity Insurance Company to pay Fed Re an "initial re-insurance premium" equal to 65% of the business-risk policy's gross premium and, after the claims period expired, a "deferred re-insurance premium" equal to 15% of the gross premium.[13]

Yield Enhancement Company, formed in 2003, was a limited partnership "fund" and the enterprise's second purported re-insurance entity.  Fidelity Insurance Company owned Yield, and Crithfield was a director of Yield.  INMIHAAB, an entity managed by Donaldson, was Yield's general partner.  In an "insurance guaranty agreement" between Fidelity Insurance Company and Yield, Fidelity Insurance Company purportedly retained 15% of the business risk policy's risk of loss and ceded the remainder to Yield.  Under the agreement, the "consideration" for

---

[12] (Tr. 343 (Walsh); Tr. 346 (Babbel); Exs. 705, 705-a, 705-c, 705-f)

[13] (Tr. 343 (Walsh); Tr. 346 (Babbel); Exs. 221-1a1, 705, 705-a, 705-c, 705-f)

Yield is equal to 85% of the gross premium[14] minus the sum of any claim and an administrative fee.  Yield entered into a "subscription agreement" with an LLC, which agreed to become a limited partner in Yield after depositing an initial capital contribution and agreeing to a "total capital commitment."  Fidelity Insurance Company supposedly paid Yield after the business-risk policy expired, and Yield supposedly paid the LLC the remaining premium after subtracting the sum of a claim and an administrative fee.[15]

### D. The legal opinions

Under 26 U.S.C. § 162, a business may deduct "ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." If a premium is ordinary and necessary, 26 C.F.R. § 1.162-1(a) allows the deduction of an "insurance premium[] against fire, storm, theft, accident, or other similar [business] losses."[16]

In 2001, Brian Casey, a lawyer with Morris, Manning & Martin and later with Lord Bissell & Brook, issued to Fidelity Insurance Company a tax opinion about the

---

[14] In Yield's standard agreement with Citadel Insurance Company, Yield's "consideration" is equal to 83% of the policy's gross premium.

[15] (Tr. 346 (Babbel); Tr. 349 (Dubinsky); Exs. 1C, 140, 208-5k, 221-1a1, 400)

[16] *See Couch on Insurance*, Vol. 4, § 63:3 ("Whether premiums paid for insurance are deductible from income depends largely on who paid the premiums and the type of insurance at issue, with property and liability insurance premiums generally deductible only if the payor can establish that the insurance coverage is an ordinary and necessary expenses of carrying on any trade or business, or of an individual's efforts to produce income.").

BPP.  The 2001 opinion, issued after Casey moved his law practice to Lord Bissell &

Brook, asserts that under the BPP a business purchasing a business-risk policy "more

likely than not . . . will be entitled to a federal income tax deduction under

[Section 162] for the amount of the insurance premiums paid by the Business to

Fidelity Insurance Company."  (Ex. 600 at 1)  The 2001 opinion expressly relies on

dozens of "factual assumptions" about the structure, functioning, and promotion of

the BPP, including that a business that purchases a business-risk policy must transfer

to Fidelity Insurance Company the particular risk-of-loss covered by the policy and

that the policy's premium must result from an arm's-length and actuarially sound

underwriting calculation.  Fidelity Insurance Company supplied most of the "factual

assumptions" on which the 2001 opinion depends.[17]

     In 2003, Fidelity Insurance Company asked Casey to issue a fresh opinion

about the BPP, but Lord Bissell & Brook required a second lawyer's approval before

Casey could issue another opinion.  After reviewing documents provided by First

Fidelity Trust and after speaking to the defendants, the Lord Bissell & Brook lawyers

determined that neither Fidelity Insurance Company nor Fed Re retained any risk of

loss on the BPP's business-risk policies.  In an August 2003 letter, Casey withdrew

the 2001 opinion and asserted that Fidelity Insurance Company misrepresented

material facts about the BPP.  The August 2003 letter explains that, because "all or

---

[17] (Exs. 600, 705, 705-a, 705-c, 705-f)

nearly all losses under [a business-risk policy] were to be funded by" the LLC "in which the business owner's trust's life insurance policy invests," the BPP creates an incentive for the owner "to cause the business not to file claims under the [business-risk policy], with the result that the [BPP] lacks sufficient substance to support the tax opinion sought."[18]  (Def. Ex. 10E at 1–3)

In October 2003, Michael Comiskey, another lawyer at Lord Bissell & Brook, sent Fidelity Insurance Company a letter identifying additional problems with the BPP.  The October 2003 letter states that "the pivotal facts represented to us that are not true" include that Fidelity Insurance Company retains "all liability for the first 5% of each loss incurred" under each business risk policy and that "an independent, bona fide third-party reinsurer" retains "all liability for 20% of each loss in excess of the first 5%."  (Ex. 721 at 1)  The October 2003 letter asserts that the following facts contradict Fidelity Insurance Company's representations:

> [A loss under a business risk policy is] effectively . . . funded by the LLC in which the life insurance policy invests;
>
> Mr. Crithfield told [Lord Bissell & Brook] on August 1, 2003, that no claims had been made under any of the approximately 75 Business Risk Policies that Fidelity had issued;
>
> Mr. Crithfield also told [Lord Bissell & Brook] on August 1 that Fidelity did not establish reserves for insurance losses under the Business Risk Policies;
>
> . . .

---

[18] (Tr. 343 (Walsh); Def. Ex. 10E)

> Mr. Crithfield told [Lord Bissell & Brook] on August 15 that
> the amount of insurance premiums charged for the Business
> Risk Policies were generally one-third of the aggregate policy
> limits.

(Ex. 721 at 1–2)  The letter concludes that these facts, combined with "the disincentive" for a customer to submit a claim and to reduce — directly and dollar-for-dollar — the cash returned to the owner's control under the BPP, show that "little or no genuine expectation" existed that a business would submit a claim under a business-risk policy.[19]  (Ex. 721 at 2)

With the Lord Bissell & Brook legal opinion withdrawn amid findings of misrepresentation and with the marketing of the BPP compromised, Fidelity Insurance Company immediately shopped for a new tax opinion, and in December 2003 James Duggan of Handler Thayer & Duggan obliged.  Duggan's 2003 opinion concludes that a premium paid for a business-risk policy is "more likely than not" deductible under Section 162.  Like the 2001 opinion, the 2003 opinion relies on dozens of factual assumptions, including assumptions about the real transfer of risk and the capitalization and independence of the plan's re-insurer.  Also, the 2003 opinion features a representation by Fidelity Insurance Company that in promotion, sales, and operation the enterprise's "primary emphasis is on the risk protection provided by the [BPP], and [that] any discussion of potential tax benefits is incidental."  (Ex. 212-3m)  More falsehoods.

---

[19] (Tr. 343 (Walsh); Ex. 721)

- 12 -

## II. A sham transaction

A person may lawfully structure an otherwise legitimate transaction to obtain a tax benefit. *Stobie Creek Investments LLC v. United States*, 608 F.3d 1366, 1375 (Fed. Cir. 2010) (Prost, J.). But a sham transaction, an event intended solely or predominantly to generate a tax benefit, warrants no deduction. *United Parcel Serv. of Am., Inc. v. C.I.R.*, 254 F.3d 1014, 1018 (11th Cir. 2001). If a transaction complies in form with a law that permits a deduction "but the transaction lacks the factual or economic substance that form represents, then expenses or losses incurred in connection with the transaction are not deductible." *Kirchman v. C.I.R.*, 862 F.2d 1486, 1490 (11th Cir. 1989).[20] A transaction that lacks a *bona fide* "business purpose" other than tax avoidance — that lacks an intended "economic effect" directed primarily toward a business gain other than the creation of a tax benefit — is a sham. *United Parcel Serv.*, 254 F.3d at 1018.

### A. No business purpose

Resolving "whether the taxpayer had a legitimate business purpose in entering into the transaction involves a subjective analysis of the taxpayer's intent." *Kirchman*, 862 F.2d at 1492. The evidence in the present instance demonstrates beyond a reasonable doubt (1) that avoiding tax — rather than insuring against

---

[20] *Accord United States v. Heller*, 866 F.2d 1336, 1341 (11th Cir. 1989) ("[F]ederal tax law disregards transactions lacking an economic purpose which are undertaken only to generate a tax savings. Federal tax law is concerned with the economic substance of the transaction under scrutiny and not the form by which it is masked.").

business risk — motivated business owners to participate in the BPP and (2) that creating a profitable mechanism for the avoidance of taxes and not insuring clients against business risk motivated the defendants to create and implement the BPP.

The evidence shows that the defendants' enterprise promoted the BPP as a tax-avoidance scheme. For example, during conversations between McNamee, the president of Fidelity Insurance Company and other entities in the enterprise, and William Salinski, an undercover IRS agent, McNamee explained that the plan's "real purpose is to shelter the income" and that "what we're really trying to do is lower the profits in [a] business." (Ex. 75-T at 7) At Foster & Dunhill's presentations promoting the plan, tax avoidance pervades Donaldson's pitch:

> [E]ach quarter as [the business owners] are doing their estimates, they realize that the dollars that they send to the IRS are going to be gone and the dollars that they send to the Business Protection Plan assuming no claims, are going to get eighty-five cents on the dollar back and, of course, when I do that myself I would just as soon send it to the insurance company as to send it to the IRS.[21] The amount that you can use in the Business Protection Plan is up to you to determine on a year-by-year basis so that most people gear it to the profits that are occurring on a quarterly basis. So that in a given year you might say well, this year I'm going to be able to put away $60,000 pretax because I'm going to have an after tax investment in the neighborhood of $36 to $38,000. (inaudible) And the following year they say I'm having a good year and I can afford to take $400 thousand out- (inaudible) — pretax. So what you're basically doing is planning on a year-by-year basis. And the only restriction, of course is that you have sufficient reserves to do it.

---

[21] (Exs. 52-T; 63-T; 75-T; 77-T-2, 221-1a1)

(Ex. 63-T at 4–5)  Among other inculpatory evidence, this statement by Donaldson affirmatively negates his implausible claim of a belief that he was selling bona fide insurance for a business reason and affirmatively establishes his guilty knowledge of the fraudulent and criminal nature of the BPP.

The evidence proves beyond a reasonable doubt that the business owners participated in the BPP to shelter income from taxation and to protect the sheltered income from creditors, not to insure against a *bona fide* business risk.  The business owners had a load of cash to protect from the federal income tax; except to evade taxation, the business owners neither needed nor wanted the extraordinary and unnecessary insurance that the BPP offered.

Edward Williams testified that his company purchased the business-risk policy to avoid paying taxes.  (Tr. 343 at 227)  Other business owners echoed Williams.[22]  Dr. James Christenbury testified that his "biggest concern was asset protection." (Tr. 344 at 18)  In general, the business owners displayed steady indifference when choosing among the BPP's several arcane and implausible insurance coverages (certainly arcane and implausible in the circumstances of these particular insureds).[23]  For instance, Williams's business bought a business-risk policy with eight coverages,

---

[22] (Tr. 347 (Frain) at 144–45 (testifying that he participated in the BPP because Frain's lawyers at Handley Thayer & Duggan told Frain that the plan fit into his "overall tax strategy"); Tr. 347 (Fuller) at 175 (testifying that he participated in the BPP "to lower [his] taxes"))

[23] (Tr. 344 (Christenbury) at 144–45 (testifying that his business bought kidnapping insurance coverage and criminal-defense coverage because Donaldson recommended the coverages and not because Christenbury needed the coverages)

- 15 -

none of which he had sought or acquired in an earlier year.  Williams testified that, if the defendants' enterprise randomly had selected eight coverages, "it [probably] would not have made any difference" to whether Williams participated in the BPP. (Tr. 343 at 235)  Although Richard Frain never traveled outside the United States, Richard Frain's company applied for "international travel accident" coverage.[24] (Tr. 347 at 127–29)  The selection of coverages marketed by the enterprise and the array of coverage purchased by the businesses were wholly unaccountable by the ordinary, necessary, or even plausible needs of the business.  The coverages — each a remote, faint, and unconvincing echo of some legitimate coverage — were a clumsy and conspicuous ruse, transparent at a glance by an informed observer, necessarily and undeniably including Crithfield and Donaldson.

In 2002, Donaldson met with Dr. Christenbury, who explained that his biggest concern was "asset protection."  (Tr. 344 at 18)  Although Christenbury already possessed medical malpractice insurance, Christenbury wanted to protect assets "over and above" his current insurance.  (Tr. 344 at 18)  Donaldson recommended a $600,000 budget for coverage and presented Christenbury with a completed application form.  In addition to coverage for excess professional liability, the selected coverages included "international kidnap/ransom investigation expense" and "criminal defense legal expense reimbursement."  Although Christenbury needed

---

[24] (Ex. 205-4d4)

no coverage other than excess professional-liability coverage, Christenbury testified that Donaldson recommended the additional coverages because they "sort of added value even though they're pretty rare and it wouldn't cost any more [money]."[25] (Tr. 344 at 144)  Christenbury ultimately paid a $500,000 premium for business-risk policy covering his business in 2003.

In 2003, after settling a malpractice suit, Christenbury testified that he called Donaldson and asked for a claim form:

> I asked Mr. Donaldson if there was a claim form that I could have in case I needed to file a claim and he chuckled and said, there's no claim form. No one has ever filed a claim. The whole idea is not to file a claim. But don't worry, 85 percent of your premium will go into your trust account.

(Doc. 344 at 34)  Christenbury testified that, when Christenbury confronted Donaldson about his discovery that Casey withdrew the 2001 opinion, Donaldson "knew about the letter and he said, that's not a problem, we will get another tax opinion from a law firm in Chicago, and I recommend you invest more money before the end of the year."[26]  (Doc. 344 at 37)

Accordingly, the United States proves beyond a reasonable doubt that the defendants' enterprise promoted the BPP as a scheme creating a tax deduction and

---

[25]  (Tr. 344 (Christenbury); Ex. 204-2d1)

[26]  At trial, Donaldson's counsel cross-examined Christenbury about a 2012 deposition in a separate case at which Christenbury explained that Donaldson did not say that "whole idea [of the BPP] was not to file claims." (Docs. 330, 330-1) Although this deposition testimony is inconsistent with Christenbury's testimony at trial, I consider Christenbury's testimony credible.

that customers participated in the BPP to capture and exploit that deduction.  Neither good-faith intent to insure against a genuine risk nor any other ordinary and necessary business purpose primarily (or even detectably) motivated the business owners.  From day one, the BPP was — by design, by intent, by implementation, and by effect — a criminal scam to avoid taxes.

## B. No economic effect

Even if a legitimate business purpose motivates a business owner, a transaction that lacks an "economic effect" and that functions only to produce a tax deduction is a substantive sham.  *Kirchman*, 862 F.2d at 1492.[27]  Several aspects of the scheme compel the conclusion that no economic effect resulted from the BPP.  First, genuine insurance requires the shifting and the distribution of a risk.  *Steere Tank Lines, Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978).[28]  Risk shifting occurs if a party transfers a risk of loss to a second party, and risk distribution occurs if the party assuming the risk shares "his potential liability, in part, among others."  *Beech Aircraft Corp. v. United States*, 797 F.2d 920, 922 (10th Cir. 1986) (McWilliams, J.).  If the

---

[27] *Accord Stobie Creek*, 608 F.3d at 1376 ("A transaction lacks 'economic reality' when the tax result . . . is 'purely fictional.'"); *United Parcel Serv.*, 254 F.3d at 1018 ("The kind of economic effects required to entitle a transaction to respect in taxation include the creation of genuine obligations enforceable by an unrelated party." (internal quotation marks omitted)).

[28] *See also Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941) ("Historically and commonly insurance involves risk-shifting and risk-distributing. . . . That these elements of risk-shifting and risk-distributing are essential to a life insurance contract is agreed by courts and commentators.").

insured retains the risk of his own loss, the arrangement is self-insurance, which "is

not the equivalent of insurance." *Beech Aircraft Corp.*, 797 F.2d at 922.[29]

       In form only (assuming the necessary formalities occurred, which they did

not), the BPP describes an insurance arrangement between the business and Fidelity

Insurance Company or Citadel Insurance Company.  The evidence shows beyond

any reasonable doubt that the BPP is not insurance because no risk shifting or risk

distribution resulted in fact.  Thomas Walsh, the attorney at Lord Bissell & Brook

who reviewed the BPP and the 2001 opinion, testified that an accounting schedule

provided by Fidelity Insurance Company materially affected Lord Bissell & Brook's

review of the 2001 opinion.  According to the schedule:

- Under a business-risk policy, a particular business paid a $1,976,256 premium for $6,000,000 of aggregate-loss coverage;

- Fidelity Insurance Company purportedly retained $300,000 of the risk (5% of the total risk covered) and transferred $5,700,000 (95%) of the risk;

- Of the $5,700,000, Fed Re purportedly retained $1,140,000 of the risk (20%, which is 19% of the total risk covered);

- Of the $5,700,000, the LLC, which the business owner ultimately controlled, retained $4,560,000 of the risk (80%, which is 76% of the total risk covered);

- Fidelity Insurance Company retained $691,689.60 of the cash amount of the premium (35%) and purportedly transferred $1,284,566.40 of the cash amount (65%) to Fed Re;

---

[29] *Accord F.W. Services, Inc. & Subsidiaries v. C.I.R.*, 459 Fed.Appx. 389, 393 (5th Cir. 2012) (per curiam) (stating that "if a contract requires the 'insured' to pay all losses, then there is essentially no risk-shifting to the 'insurer' — thus no risk and no resulting 'insurance'").

- After paying fees, commissions, and taxes, Fidelity Insurance Company held $335,713.52 of the cash amount of the premium, which exceeds the Fidelity Insurance Company's retained risk, $300,000; and

- Fed Re purportedly held $1,284,566.40 of the cash amount of the premium, which exceeds the risk Federation Re retained, $1,140,000.

(Ex. 712-a2 at 1)

The accounting schedule suggests that from the premium Fidelity Insurance Company and Fed Re retained cash that exceeded the retained risk. Even if the insured business suffered a major loss and claimed a major indemnity against the policy, under the accounting schedule, the payment on a claim would flow either from the cash amount of the premium or from the LLC. Walsh persuasively concluded — and the evidence proves beyond a reasonable doubt — that the BPP shifts no risk to the enterprise:

> [T]he substance of this is that [Fidelity Insurance Company] never has any risk of loss, Fed Re never has any risk of loss, and if there are no claims, all the money ends up in the [segregated account] except for the [amount] that comes off the top.
>
> And if there are claims, working backwards it appeared that in effect the money would come from [the segregated account], because it would come from funds that either the portion of the premium that would have ended up in the [segregated account] or from monies that were already in the [segregated account].

(Tr. 343 (Walsh) at 58–62)

- 20 -

Second, the particular risks against which the BPP coverages insured were events that, given the circumstances of the "insured," were remote in the extreme (at best) and certainly not "ordinary and necessary" — in any rational or comprehensible sense of the phrase — for the particular insured.[30] A list of the "insurance coverages" offered by the BPP (Ex. 212-3m at 18–19) demonstrates the point vividly:

1.  Disability Expense Reimbursement Protection
2.  Excess Mental Health Expense Reimbursement
3.  Health Insurance Difference In Conditions Expense Reimbursement
4.  International Travel Accident
5.  International Travel Medical Expense Reimbursement
6.  International Travel Disability
7.  International Communicable Disease Medical Expense Reimbursement
8.  International Kidnap/Random Investigation Expense
9.  Tax Audit Defense Legal Expense Reimbursement
10. Criminal Defense Legal Expense Reimbursement
11. Regulatory Investigation Defense Legal Expense Reimbursement
12. Injunctive Relief Defense Legal Expense Reimbursement
13. Bankruptcy Legal Expense Reimbursement
14. Key Supplier Loss Expense Reimbursement
15. Key Customer Loss Expense Reimbursement
16. Product Recall Loss Expense Reimbursement
17. Market/COGS Fluctuation Loss Expense Reimbursement
18. Currency Risk Loss Expense Reimbursement
19. Research and Development Expense Overrun Reimbursement
20. Excess Professional Liability Legal/Claim Expense
21. Excess Professional Liability Loss Reimbursement
22. Professional Liability Related Business Interruption Expense Reimbursement

---

[30] (*See* Ex. 64-T (McNamee) (stating that an owner should "remember that the purpose of [the BPP] is to choose things you don't think will happen")

Third, the evidence shows that the defendants' enterprise failed to calculate the premiums for business-risk policies at arm's length or in a timely and an actuarially sound manner. David Babbel, an expert for the United States, testified persuasively that the gross premium on a business-risk policy was "very high relative to the amount of coverage."[31] (Tr. 352 at 103) No actuary designed or priced the business-risk policies in the BPP. Either the business owner, the owner's advisor, or Donaldson selected the premium amount based on the taxable income the owner wished to shelter.[32]

Months after a business purchased a policy, the underwriting firm Ashton Tiffany calculated a premium for the selected coverages. The enterprise unilaterally adjusted the coverages to match the taxable income the business owner aspired to shelter. An illustration: Examining the fifteen instances in which the United States was able to secure the insurer's (Fidelity Insurance Company's or Citadel Insurance Company's) invoice for an "insurance" premium, twelve of the invoices were dated after the BPP premium had already been paid by the business owner, while the remaining three invoices were issued on the same day as the premium payment.

---

[31] (*See also* Tr. 346 (Babbel) ("And normally — and this is key, normally businesses would want to minimize insurance premiums, but with the [BPP], business owners actually benefit from the high insurance premiums.").

[32] (*See* Tr. 343 (Williams) at 186–87 (testifying that he selected a premium amount by determining his business's gross profit so he could "utilize as much of the benefit of the [BPP] as possible"); Tr. 344 (Christenbury) at 25–27 (testifying that Donaldson recommended a $600,000 premium for medical malpractice coverage))

A further comparison of the fifteen invoice dates with the dates listed on the corresponding underwriting memorandums reveals that the underwriting memorandums were drafted on average approximately seventy-three days after the issuance by the insurer (Fidelity Insurance Company and, later, Citadel Insurance Company) of the corresponding invoices.  Some of the underwriting took months to finalize.  For example, on or about November 29, 2006, taxpayer Frain signed an application (which he did not fill out himself); the next day, Frain's business paid the BPP premium to Citadel Insurance Company.  On December 31, 2006, Citadel Insurance Company issued a BPP invoice for the premium that had already been paid.  The corresponding underwriting memorandum was not prepared until April 2, 2007.  Likewise, taxpayer Fuller selected and paid a BPP premium of $468,587.67 on October 31, 2006.  The corresponding underwriting memorandum — with a quote of $457,566 — was completed 140 days later, on March 20, 2007.  Taxpayer James paid his BPP premium not just before the underwriting occurred, but before he even applied for the BPP.

In a conversation with Salinski, McNamee explained:

> I think the first question is how much premium do you want to pay for the business protection policy? In other words, how big of a deduction do you need to take?
>
> . . .
>
> And — and then — and then from there we can work backwards . . . to see what it would take in terms of a life policy. And if you say that's too much, I can't fund that much,

> then we'll just have to take a lower deduction, you know. So
> we'll have to just work backwards until they balance — and —
> and you can get the biggest deduction you can afford to, you
> know, fund.

(Ex. 64-T at 8)[33]  In practice, the BPP sold phony insurance acquired through a jury-rigged premium and designed to offer illusory protection against an implausible risk and to result in an extraordinary and unnecessary business expense that, nonetheless, was deducted entirely and 85% of which was repaid promptly.[34]

Fourth, the BPP's re-insurance arrangement was a sham designed to create the appearance of risk distribution.  The standard re-insurance agreement between Fidelity Insurance Company and Fed Re required Fidelity Insurance Company to pay Fed Re a total "re-insurance premium" equal to 80% of the gross premium on the business-risk policy.  But, as Toni Brady (an accountant at Offshore Trust Services) convincingly testified, Fidelity Insurance Company transferred no money to Fed Re.  An e-mail from the Offshore Trust Services controller to Crithfield shows that in February 2002 no bank account existed for Fed Re.  Even after February 2002, despite accounting gimmickry, Fed Re never received a premium or retained a risk.  Brady established that after a business paid the premium on a business-risk

_____

[33] (Tr. 352 (Babbel); Tr. 349 (Dubinsky); Exs. 1G, 52-T, 63-T, 64-T, 74-T, 204-2d1, 505-5, 522-6, 800)

[34] (Tr. 343 (Williams) at 178 (testifying that at a conference Donaldson said "mathematically you understand that you're claiming against yourself to some degree"); Tr. 344 (Christenbury) at 34 ("[Donaldson said that] there's no claim form. No one has ever filed a claim. The whole idea is not to file a claim. But don't worry, 85% of your premium will go into your trust account.")).

policy the money remained in Fidelity Insurance Company's bank accounts. When a business-risk policy expired, Fidelity Insurance Company transferred the money to an escrow account and invested the money in accord with the direction of the business owner. Fed Re was not involved.[35]

Similarly, the evidence proves beyond a reasonable doubt that the claim of some meaningful transaction with Yield was a sham. Despite the requirement in the "subscription agreement," no LLC invested money in Yield, and Yield maintained no reserve to pay a claim. Although formed in 2003, Yield maintained no bank account until December 2005, and no significant transaction occurred in the account until December 2006. With no bank account and no money, Yield could not fulfill the obligation under the "insurance guaranty agreement" to pay 85% of a claim on a business-risk policy.

Beginning in December 2006, when a business-risk policy expired, Fidelity Insurance Company transferred the remaining premium to Yield's account. Typically the same day, Yield transferred the remaining premium back to Fidelity Insurance Company. The enterprise transferred the remaining premium to an escrow account and invested the money in accord with the direction of the business owner. Yield's existence produced, at most, nothing but an accounting entry.[36]

---

[35] (Tr. 342 (Brady); Tr. 349 (Dubinsky); Exs. 310-1, 602, 705-c)

[36] (Tr. 342 (Brady); Tr. 349 (Dubinsky); Exs. 30L, 304, 306)

The whole history, structure, and operation of the BPP emits the unmistakable and pungent aroma of fraud.  Corporate names that evoke the indistinct image of a legitimate business: Fidelity, Citadel.  Premiums that coincide perfectly with the income the taxpayer wants to shelter.  An extraordinarily high ratio of coverage to premium that would immediately alert any reasonable person to trouble.  Coverage for an implausible risk not typically insured by the taxpayer or a similarly situated taxpayer.  The BPP's tacit agreement, enforced by an obvious incentive, not to assert a claim against the insurance.  Actuarially unsound and tardy underwriting.  The return to the taxpayer's control of almost all the "insurance" premium.  "Offshore" offices of the participating companies on exotic Caribbean islands.  Lengthy and complex legal opinions, based on pages of assumed but materially false "facts," permitting the BPP to announce "approval" by the lawyers.  A deal "too good to be true."

In sum, the United States proved to the exclusion of any reasonable doubt that business owners participated in the BPP to shelter taxable income and that the BPP lacked economic substance as an insurance program.  Because the BPP is a sham that is disregarded under governing law, a premium paid for a BPP business-risk insurance policy is — to say the least and as Crithfield and Donaldson fully knew — not an ordinary, necessary, and deductible business expense under Section 162.

- 26 -

Although a detailed refutation of each purported "fact" in each defendant's proposed findings and conclusions is unnecessary and adds little or nothing, one specific statement warrants attention because the underlying issue has generated much animosity and many papers during this action.  This issue appears, among other places, in Donaldson's proposed findings at paragraph 70 (Doc. 360 at 26):

> The government asserts that the crime in this case is either making misrepresentations to a law firm (Lord Bissell) upon which [Lord Bissell] based their opinion, or failure to properly implement an opinion of a second law firm (HTD).

The defense has persisted in this incoherent and indefensible contention throughout this action, despite numerous attempts by the United States and the presiding judge to penetrate the defense's impenetrable shell of resistence to the plain and simple facts.  As early as January 2014, an order (Doc. 89) attempts to explain that neither defendant is charged with misstating to a law firm or failing to "properly implement [a legal] opinion."  As repeatedly explained to defense counsel, the United States' interest in the issuance and withdrawal of the earlier opinion letter and the issuance of a later opinion letter is primarily to evidence that the defendants' acts, on which the three charged crimes are based, were knowingly and willfully committed.  In other words, the issuance and withdrawal of the earlier opinion letter and the issuance of the later opinion letter show that the defendants knew exactly the lies they needed to tell the lawyers (or knew, at least, what the lawyers needed to hear) in order to achieve a favorable legal opinion (necessary to successful marketing

of the BPP); that the defendants told the lawyers the necessary lies and achieved the desired opinion (which the lawyers refused to renew upon discovering the lies); and that the lawyers told the defendants exactly what was impermissible in the design and operation of the BPP.  Despite the tax lawyers' repeated warnings, the defendants marketed and operated the BPP and the associated enterprises in a manner inconsistent with the representations the defendants believed were necessary to the lawyers' opinion that participation in the BPP "more likely than not" resulted in an ordinary and necessary business expense.

If and to the extent that either defendant has raised the defense of "advice of counsel," the evidence defeats the defense by showing that the opinion letters — even if legally correct based on the stated facts — include assumptions of fact that vary dramatically and decisively from pertinent history, as Crithfield and Donaldson well knew and as they agreed and planned.  Already the source of much confusion, pettifogging, and misdirection in this action, the thrust of paragraph 70 (Doc. 360 at 26) deserves no more paper.

## III. Count one

Count one of the superseding indictment charges Crithfield and Donaldson under 18 U.S.C. § 371 with conspiring to defraud the United States by impairing or defeating the collection of revenue by the IRS.  To convict a defendant under 18 U.S.C. § 371 for conspiring to defraud the United States, the United States must

prove beyond a reasonable doubt (1) the existence of an agreement between the defendant and another person to defraud the United States, (2) the defendant's knowing and voluntary participation in the conspiracy, and (3) a conspirator's commission of an overt act in furtherance of the conspiracy. *United States v. Adkinson*, 158 F.3d 1147, 1153–54 (11th Cir. 1998); *United States v. Cure*, 804 F.2d 625, 628 (11th Cir. 1986). "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924).

Of course, a person can become a member of a conspiracy without knowing all of the details of the unlawful scheme, and without knowing all the other members. *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). A person becomes a member of a conspiracy even if that person agrees to play only a minor role in the conspiracy, so long as he understands the essential nature of the plan and willfully joins the plan at least on one occasion. *United States v. Andrews*, 953 F.2d 1312, 1318 (11th Cir. 1992); *United States v. DiPasquale*, 740 F.2d 1282, 1292–93 (3d Cir. 1984). Circumstantial evidence can prove, among other things, a person's knowledge of, and joining in, a conspiracy. *United States v. Beale*, 921 F.2d 1412, 1430 (11th Cir. 1991).

A defendant's willfulness is fairly inferred from a consistent pattern of underreporting or causing the underreporting of large amounts of income. *United States v. Schafer*, 580 F.2d 774, 781 (5th Cir. 1978). Also, willfulness is fairly inferred from proof of a defendant's pertinent background and experience, including background as an entrepreneur, *United States v. Smith*, 890 F.2d 711, 715 (5th Cir. 1989), or as a successful and sophisticated entrepreneur. *United States v. Segal*, 867 F.2d 1173, 1179 (8th Cir. 1989). Similarly, a defendant's educational accomplishments can support an inference of willfulness. *United States v. Guidry*, 199 F.3d 1150, 1157–58 (10th Cir. 1999) (defendant's accounting degree and experience as comptroller); *United States v. Klausner*, 80 F.3d 55, 63 (2d Cir. 1996) (defendant's status as CPA and his experience in tax return preparation); *United States v. MacKenzie*, 777 F.2d 811, 818 (2d Cir. 1985) (defendant's college degrees in business and economics).

As Chief Judge Carnes stated in *United States v. Hough*, 803 F.3d 1181 (11th Cir. 2015), to prove a conspiracy to defraud the United States and the IRS, that is, to prove a so-called "*Klein* conspiracy," the United States must prove the defendant's agreement "to impede the functions of the IRS," the defendant's knowing and voluntary participation in the agreement, and the defendant's commission within the applicable limitation of an act in furtherance of the agreement. 803 F.3d at 1187. Of course, the United States can muster the necessary

proof through either direct or circumstantial evidence, including "the parties' concerted actions, overt acts, relationship, and the entirety of their conduct," but the evidence must prove "a common design with unity of purpose to impede the IRS." *Hough*, 803 F.3d at 1187.

Also, the United States must prove an agreement to interfere with the IRS's collection of taxes. *Adkinson*, 158 F.3d at 1155. Further, the United States must prove that each defendant knowingly and voluntarily joined the agreement to interfere with the IRS's collection of taxes. *United States v. Kottwitz*, 614 F.3d 1241, 1265 (11th Cir. 2010), *vacated in part on other grounds*, 627 F.3d 1383. "Due to the complexity of the tax laws," a specific intent to violate the law "is a necessary element of tax offenses." *Kottwitz*, 614 F.3d at 1265 (citing *Cheek v. United States*, 498 U.S. 192, 199 (1991)).

The evidence proves beyond a reasonable doubt that the business owners participated in the BPP to avoid taxes, that the BPP lacked economic substance, and that the BPP was a sham transaction. Crithfield and Donaldson variously conceived, designed, constructed, marketed, and otherwise fully implemented and executed the BPP. As their words and actions reveal and confirm, Crithfield and Donaldson were necessarily and unavoidably aware of the nature and purpose of the BPP scheme and acted together and with others to further this unlawful plan. Considered as a whole, the evidence — both a great quantity of direct evidence and a great quantity of

circumstantial evidence — proves both Donaldson and Crithfield guilty beyond a reasonable doubt of each element of the conspiracy in violation of 18 U.S.C. § 371 to defraud the United States as charged in Count I.

## IV. Count two

To establish a violation of Section 7206(2), the United States must prove that a defendant "aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return," that the return "was false as to a material matter," and that the defendant acted willfully. *Kawashima v. Holder*, 132 S. Ct. 1166, 1173 (2012). Section 7206(2) "relies on a theory of liability akin to complicity: it criminalizes an act that facilitates another person's crime when the act is undertaken willfully and with knowledge of the circumstances that make the other person's act illegal." *United States v. Clark*, 577 F.3d 273, 285 (5th Cir. 2009) (Prado, J.). A defendant's willful "creation, organization, and operation" of a fraudulent tax shelter that results in the preparation or presentation of a return false as to a material matter constitutes a violation of Section 7206(2). *United States v. Kelley*, 864 F.2d 569, 576–77 (7th Cir. 1989) (Flaum, J.) (citing *United States v. Schulman*, 817 F.2d 1355 (9th Cir. 1987) (Tang, J.), and *United States v. Solomon*, 825 F.2d 1292 (9th Cir. 1987) (Goodwin, J.)).

In December 2006, Brian James, as the president of Brian James, M.D., P.A., ("B.J., MD PA" in the indictment) paid Citadel Insurance Company $60,000 for a business-risk policy in the BPP. In September 2007, Brian James, M.D., P.A.,

submitted a tax return for 2006 claiming "other deductions" that included the $60,000 premium.[37]  Count two of the superseding indictment asserts that Crithfield and Donaldson violated 26 U.S.C. § 7206(2) by willfully aiding and assisting in, procuring, counseling, advising, or causing the presentation of James's business's 2006 tax return, which was false.  (Doc. 47 at 8)

The evidence shows that James's business's 2006 tax return was false as to a material matter.  The BPP is a sham transaction, and James's business was not entitled under Section 162 to deduct the premium paid for the business-risk policy. James testified that Donaldson was James's "primary consultant" in purchasing the BPP.  (Tr. 348 at 14)  James testified that Donaldson explained the BPP as an "asset protection mechanism."  (Tr. 348 at 14 ("What I thought was that this was all part of the asset protection investment mechanism, that it was all part of one same deal. And that's the way Mr. Donaldson explained it to me when I first went to him, because that's what I was looking for."))  In the early 2000s, Donaldson met with James on several occasions to sell James on the BPP, and James attended a conference in Mexico at which Donaldson promoted the BPP.  As a result of Donaldson's efforts, James purchased the BPP for his businesses for each tax year from 2001 to 2006.[38] By conceiving, designing, implementing, and marketing the BPP, Crithfield and

---

[37] (Exs. 109-6, 209-6e)

[38] (Tr. 348 (James); Exs. 1G, 209-6d1, 409-6c)

- 33 -

Donaldson variously aided, assisted, procured, counseled, or caused the preparation of James's 2006 return, which was false as to a material matter.

## V. Count three

In March 2007, Edward Williams, as the owner of Safety Products, Inc., ("S. P. Inc." in the indictment) paid Citadel Insurance Company $125,000 for a business-risk policy in the BPP.  In December 2007, Safety Products submitted a tax return for the taxable year ending in March 2007 claiming deductions totaling $1,563,654, which included the $125,000 premium.[39]  Count three asserts that Crithfield and Donaldson violated Section 7206(2) by willfully aiding and assisting in, procuring, counseling, advising, or counseling the presentation of Safety Products' tax return.  (Doc. 47 at 8–9)

The evidence demonstrates beyond a reasonable doubt that Safety Products' tax return was false as to a material matter because Safety Products was not entitled to deduct from taxable income the premium paid for the BPP.  And Donaldson aided the presentation of Safety Products' tax return.  In 2005, Williams testified that he met Donaldson to "investigate an offshore asset protection program."  (Doc. 343 at 157)  Williams attended a Foster & Dunhill conference in the Bahamas at which Donaldson promoted the BPP.  Williams testified that at the conference Donaldson was the "key person involved" and the person "in charge of the flow of information

---

[39] (Exs. 120-5, 120-6, 220-6d2, 220-6d3)

[or] presentation." (Doc. 343 at 165)  At the conference, Donaldson explained to customers that if a business claimed on a business-risk policy, the claim "would reduce the premium that you would derive into the trust because of the expenditure of the claim." (Doc. 343 at 178)  Meeting again with Williams after the Bahamas conference, Donaldson asserted that the BPP would "fly with the IRS." (Doc. 343 at 182)  As a result of Donaldson's efforts, Safety Products purchased a business-risk policy and deducted the amount of the premium from the business's taxable income.[40]  Again, by conceiving, designing, implementing, and marketing the BPP, Crithfield and Donaldson variously aided, assisted, procured, counseled, or caused the preparation of Safety Products' 2007 return, which was false as to a material matter.

## CONCLUSION

The United States composed a succinct yet comprehensive conclusion, which this order adopts entirely:

> The above facts prove beyond any doubt that Crithfield and Donaldson conspired, as partners, to design, promote, market, and implement a prepackaged offshore tax shelter strategy referred to as the BPP strategy. The BPP strategy was self-insurance and devoid of any economic substance. The BPP strategy caused numerous U.S. businesses to submit tax returns to the IRS that included false and fraudulent business expense deductions based on sham "insurance premium" payments made to FIC or CIC, entities created and controlled by Crithfield and Donaldson through their maze of offshore entities.

---

[40] (Tr. 343 (Williams); Exs. 1G, 220-6d2, 220-6d3)

> The BPP premium amounts were not ordinary and necessary business expenses entitled to deduction under Section 162(a) of the Internal Revenue Code. Instead, as explained by Mr. Dubinsky, the BPP business insurance premium payments were sham expenditures and were not ordinary and necessary business expenditures. As a result, the expenditures were not properly deductible for U.S. income tax purposes on the respective businesses' 1120 and 1120S tax returns. Doc. 348 at 113:13-25. . . . [T]he trial evidence proved beyond any reasonable doubt that Crithfield and Donaldson are guilty of Counts One through Three.

Duane Crithfield and Stephen Donaldson, Sr., are **GUILTY** of the offenses charged in Counts One, Two, and Three of the superseding indictment.  A separate order will schedule sentencing for each defendant.

ORDERED in Tampa, Florida, on July 12, 2017.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE